BRITISH & FOREIGN MARINE INS. CO., Limited, v. PORTLAND FLOURING MILLS CO.

(District Court, D. Oregon. July 30, 1903.)

No. 4,624.

1. SHIPPING—LIABILITY FOR FREIGHT—CONSIGNMENT "TO ORDER."

Respondent shipped a cargo of flour, consigned "to order," by bills of lading providing that freight should be deemed earned, vessel lost or not lost. The flour was shipped under contracts of sale, and was insured by respondent in its own name for sufficient to cover the invoice price and freight. Respondent then indorsed the bills of lading and policies in blank, and attached them to drafts drawn on the purchasers for the selling price and cost of insurance. 'Held, the vessel having been lost, that respondent was liable for the freight, whether its interest in the cargo after it was loaded was that of owner or whether it merely retained a lien, since the purchasers were to have possession only on payment of the drafts.

2. SAME—DEFENSES.

The fact that the master on the wrecking of the vessel surrendered the cargo to the insurer without notice to respondent did not relieve the latter of liability for the freight; the insurer being responsible under its policy for the freight, as well as the value of the cargo.

In Admiralty. Action to recover freight.

Snow & McCamant, for libelant.
Williams, Wood & Linthicum, for respondent.

BELLINGER, District Judge. In this case the Portland Flouring Mills Company shipped by the Knight Companion, one of the vessels of the Portland & Asiatic Company, in 1901, certain freight consigned "to order,"—that is, to the order of the consignor, the

mills company. The Knight Companion was wrecked early in February, 1902, on the coast of Japan, and the cargo lost, except that there was salvage of the cargo to the value of about 62,000 yen, the equivalent of about $30,000 in our money. This salvage was undertaken by the underwriters, and the proceeds of the cargo were deposited with Samuel Samuel & Co. and one Playfair, as trustees for such underwriters. The Portland & Asiatic Company insured the freight on this cargo in the British & Foreign Marine Insurance Company, Limited, which company now brings this libel, in the right of the Portland & Asiatic Company, to recover the freight contracted to be paid on the cargo so shipped. All the flour of certain brands shipped to Hongkong by the respondent is handled by a Chinese syndicate. The sales are confined to the company's agent at Hongkong, through whom orders are made. The members of the syndicate receive the flour in certain fixed proportions, designated by shares; one firm having three shares, another two, and the third one. The shipments are divided into six parts, and distributed in proportion to the shares held. On August 29, 1901, the Portland Flouring Mills Company received from its Hongkong agent what the president of the company characterizes as "a cable confirmation of a contract for an amount of flour, a portion of which, amounting to 129,868 quarter sacks, was shipped on the Knight Companion." This is explained to mean a cable offer for flour, understood from the course of dealing to be intended for the members of the syndicate, with a request that the offer be confirmed, which was done, according to the shares of each. The flour was placed on board the Knight Companion. Bills of lading were issued by the carrier, and accepted by the mills company; by which it was stipulated that the flour shipped was to be delivered "at the vessel's tackle unto the Portland Flouring Mills Company, or to his or their assigns, freight on same as per margin, to be collected in United States gold coin or its equivalent; the several freight and primages to be considered as earned, steamer or goods lost or not lost at any stage of the entire transit." On the margin of each of the bills of lading were the letters "N' f' y" or the word "Notify," followed by the name of the firm on whose account the shipment is alleged to have been made. Policies of insurance in the name of the respondent were taken out at the invoice price, and 40 per cent., which included freight, and drafts drawn at 60 days' sight on the members of the syndicate, in the proportion of their shares, for the selling price of the flour plus cost of insurance. These policies, one for each member of the syndicate, although in the name of the mills company, and the several bills of lading, were indorsed in blank, so that they were available to the holder. The drafts, with the policies and bills of lading so indorsed, were delivered to Ladd & Tilton, bankers of respondent, and the amount placed to the latter's credit.

It is contended in behalf of the respondent that it was not the shipper of the flour in question; that it was sold, in pursuance of the course of business adopted by the mills company, prior to shipment f. o. b. at Portland; that the shipment, therefore, was not on

account of the mills company, but of the purchasers at Hongkong; that, notwithstanding the terms of the bills of lading, the facts of the shipment were known to the Portland & Asiatic Company; that that company knew that the shipment was not in fact being made by the Portland Flouring Mills Company, but was made by purchasers of the cargo in Hongkong, and was being shipped on their account. The president of the respondent company testifies that the flour stood as security for the drafts. Whether the interest of the respondent was that of ownership or lien, the parties for whom the flour was intended were to have it when paid for, and not before. In whatever light the transaction is viewed, this is what it comes to. The consignment in the bills of lading to the respondent's order and the insurance in its name were to this end, and the conclusion is unavoidable that the respondent was the shipper, and to it the carrier's service, whether for receiving the freight and agreeing to carry it, or for in fact carrying it, was rendered; and, as the case stands, the respondent is responsible for the freight agreed to be paid.

The respondent complains that the master of the vessel abandoned the wreck to the underwriters without endeavoring to save the cargo, and without communicating with the respondent, as he should have done, if the respondent was the owner of the cargo; that the loss of more than enough flour to pay the entire freight is due to the master's failure either to salve the flour for account of the respondent, or, at the least, to notify it, so that it could protect itself; that the insurance is a matter wholly between the owner and the insurer, and the master had no right to dispose of the insured cargo to the underwriters. But the respondent has not been prejudiced by any of the matters complained of. The insurers stood in its place. They were responsible to the latter for the price of the flour and freight charges, and for more, since the 40 per cent. insurance above the invoice price covers more than freight. They assumed to answer for the entire shipment, salved or otherwise, for the freight charges, and for such profits as were included in the 40 per cent. after paying such charges. The respondent had no interest to be served by notice of the wreck or other act on the master's part. It was assured of all its interests and responsibilities in the flour shipped. If the freight covered by the insurance has been paid to the firms upon whom the drafts were drawn, it has been done through the respondent's act, and it is the respondent who must have recourse to that fund for indemnity for the obligation it is under to the carrier, whose service it contracted for and received.

The libelant is entitled to the relief prayed for, and there must be a decree accordingly.